2004-NMCA-078

93 P.3d 775

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Thomas BOBLICK, Defendant–Appellant.**

**No. 23,160.**

Court of Appeals of New Mexico.

May 10, 2004.

Certiorari Denied, No. 28,697, June 22, 2004.

Patricia A. Madrid, Attorney General, Patricia Gandert, Assistant Attorney General, Santa Fe, NM, for Appellee.

Shannon L. Oliver, Joseph P. Kennedy, Kennedy & Oliver, P.A., Albuquerque, NM, for Appellant.

## OPINION

FRY, Judge.

{1} Defendant Thomas Boblick appeals the denial of a motion to suppress evidence seized from his person subsequent to a law enforcement officer's patdown search for weapons. The State claims that the search was not a Fourth Amendment seizure but instead was a voluntary "community caretaking" encounter. The State further argues that officer safety concerns justified the patdown. Defendant contends that the officer's actions exceeded the bounds of a voluntary welfare check, and that in any event the patdown violated his constitutional rights because the officer had no articulable reasons for the weapons check. We agree with Defendant and reverse.

## BACKGROUND

{2} The events leading to this appeal were set into motion when law enforcement officers responded to a dispatch regarding a suspicious parked car. Two deputies from the Bernalillo County Sheriff's Department arrived at the scene, a vacant lot behind an auto parts store. Because it was night, the officers aimed their vehicle spotlights at the car. The officers then approached the car and observed Defendant, who appeared to be unconscious, seated inside the car. They could see that Defendant's hands were in his lap and there was nothing in his hands. The officers knocked several times on the windows. The knocking roused Defendant, who appeared dazed and had a questioning facial expression. One of the officers, Deputy Medrano, asked whether Defendant was okay, and Defendant did not respond verbally. Nevertheless, when Medrano opened the car door, Defendant followed Medrano's instructions to step out of the car. There was conflicting testimony about whether Defendant got out of the car on his own or whether Medrano physically helped Defendant out of the car. In any event, Defendant got out of the car and complied with Medrano's subsequent request that he produce his driver's license.

{3} Medrano then asked Defendant whether "he had any weapons or anything illegal on him that [Medrano] needed to know about." After getting no verbal response from Defendant, Medrano conducted a patdown. He felt a bulge in one of Defendant's pockets. Medrano asked Defendant what it was, and Defendant replied with words along the lines of "go ahead and check." Inside the pocket, Medrano discovered a quantity of cash along with some baggies containing white powder.

{4} The white powder obtained from Defendant's pocket provided the basis for the State to charge him with one count of possession of methamphetamine with intent to dis-

tribute. As for why Defendant was unconscious, it appears that his condition resulted from diabetes. Testimony in the trial court indicated that while sitting in his car on the evening in question, he had eaten ice cream, which caused a disturbance in his blood-sugar level that rendered him temporarily unconscious. The State apparently does not dispute that Defendant is diabetic and that he carries in his wallet a card identifying himself as such.

{5} Defendant filed a motion to suppress the methamphetamine as the fruit of an illegal search and seizure in violation of the Fourth Amendment to the United States Constitution and Article II, § 10 of the New Mexico Constitution. The trial court denied his motion. Defendant entered a conditional guilty plea, reserving the right to appeal the trial court's denial of the motion to suppress. This appeal followed.

## DISCUSSION

### Jurisdiction

{6} Preliminarily, we resolve a question about this Court's jurisdiction to hear Defendant's criminal appeal. The events underlying this case resulted in a civil forfeiture proceeding as well as a criminal prosecution. Pursuant to the constitutional requirements set out in *State v. Nunez*, the two actions were consolidated into a single, bifurcated proceeding. 2000–NMSC–013, ¶ 104, 129 N.M. 63, 2 P.3d 264. In March 2002, Defendant filed his notice of appeal from his criminal conviction. At that time, however, the trial court had not entered a final order in the civil forfeiture. In the absence of a final order, the trial court retained jurisdiction over the entirety of the bifurcated proceeding, and this Court lacked appellate jurisdiction over the purported appeal. *See Curbello v. Vaughn*, 76 N.M. 687, 687, 417 P.2d 881, 882 (1966) (holding that the trial court retains exclusive jurisdiction until entry of a proper judgment or order); *see also Martinez v. Martinez*, 101 N.M. 493, 495, 684 P.2d 1158, 1160 (Ct.App.1984) (recognizing that although the filing of a notice of appeal ordinarily divests the trial court of its jurisdiction, the trial court retains narrow, residuary power for the purpose of effecting an appeal).

{7} This state of affairs persisted through the calendaring and briefing phases of the appeal process, prompting the State to argue in its answer brief that we must dismiss the appeal for lack of jurisdiction. Subsequent to briefing, however, the trial court entered an order releasing the seized property and declaring all proceedings in this matter concluded. Upon the entry of that order, this Court acquired jurisdiction based on the notice of appeal that was already filed. *Southwest Research & Info. Ctr. v. State*, 2003–NMCA–012, ¶¶ 20–21, 133 N.M. 179, 62 P.3d 270 (indicating that the premature filing of a notice of appeal does not divest this Court of jurisdiction that it obtains upon the final adjudication of the controversy below). We will not unnecessarily postpone this Court's review by remanding solely for the purpose of requiring a new notice of appeal. *See State v. Esparza*, 2003–NMCA–075, ¶ 38, 133 N.M. 772, 70 P.3d 762. Instead, we construe the notice of appeal as timely filed subsequent to the final order.

### Motion to Suppress

{8} Turning now to the trial court's ruling on the motion to suppress, we review de novo whether the law was correctly applied to the facts, giving deference to the trial court's factual findings. *State v. Nemeth*, 2001–NMCA–029, ¶ 20, 130 N.M. 261, 23 P.3d 936; *State v. Leyba*, 1997–NMCA–023, ¶ 8, 123 N.M. 159, 935 P.2d 1171.

{9} The State argues that the trial court properly denied Defendant's motion because his encounter with law enforcement was a voluntary community caretaking encounter that involved no coercion or detention, also known as a welfare check. Therefore, the State contends, Fourth Amendment constraints on search and seizure never came into play. We disagree.

{10} To be sure, law enforcement officers are free to "approach an individual, ask questions, and request identification without the encounter becoming a seizure under the Fourth Amendment." *State v. Walters*, 1997–NMCA–013, ¶ 18, 123 N.M. 88, 934 P.2d 282. Whether a police-citizen encounter becomes a seizure in the constitu-

tional sense depends on the objective test of whether an innocent, reasonable person, under the totality of the circumstances, would have felt free to refuse an officer's requests. *Id.* ¶ 12. Although the trial court made no specific findings about whether Defendant was seized, *see State v. Baldonado,* 115 N.M. 106, 108, 847 P.2d 751, 753 (Ct.App.1992) (stating that we apply substantial evidence review to the trial court's determination of whether a reasonable person would feel free to leave), we doubt that a reasonable person would feel free to leave after officers knocked on his car window, asked him to exit the vehicle, and questioned him about weapons. *See Walters,* 1997–NMCA–013, ¶ 18, 123 N.M. 88, 934 P.2d 282 (indicating that the presence of several officers and displays of authority are factors tending to show that a police-citizen encounter is a seizure). These facts represent a greater show of authority than in *Walters,* where a driver voluntarily stopped his vehicle on a deserted road, and the police officer who was following him in a nonthreatening manner approached his car and asked him why he stopped. *Id.* ¶¶ 2–6. In Defendant's case, when Medrano asked him to get out of the car and began questioning him, the encounter resembled an investigatory detention more than it did a welfare check. Medrano himself testified that after Defendant produced his driver's license he was not free to leave.

{11} More important, regardless of whether the community caretaker doctrine justified the officers' actions beyond the initial contact with Defendant, an officer who acts in the community caretaker capacity is still subject to state and federal constitutional constraints with respect to a weapons frisk because it is distinct from a welfare check. *See id.* ¶ 10 (drawing the distinction between a community caretaker encounter and an investigatory stop, which is a type of seizure); *see also Nemeth,* 2001–NMCA–029, ¶ 27, 130 N.M. 261, 23 P.3d 936 ("[I]t is clear that many community caretaker actions can and do implicate the Fourth Amendment."). In order to subject a citizen to a protective frisk for weapons, the officer "must have a sufficient degree of articulable suspicion that the person being frisked is both armed *and* presently dangerous." *State v. Vandenberg,* 2003–

NMSC–030, ¶ 22, 134 N.M. 566, 81 P.3d 19 (emphasis added).

{12} Case law establishes that officer safety concerns can arise from a variety of fact patterns other than the obvious situation of a "characteristic bulge" that appears to be a weapon concealed in a suspect's clothing. *See* 4 Wayne R. LaFave, *Search & Seizure* § 9.5(a) (3d ed.1996). For example, in *Vandenberg,* a defendant's physical manifestations of anxiety that exceeded mere "simple nervousness," coupled with other specific officer observations, invoked officer safety. 2003–NMSC–030, ¶¶ 27–31, 134 N.M. 566, 81 P.3d 19. In *State v. Haddenham,* a store clerk's report of hostile and harassing actions by an intoxicated individual who was known to cause disturbances was sufficient to justify a patdown. 110 N.M. 149, 154, 793 P.2d 279, 284 (Ct.App.1990). "[T]he officer does not have to await the glint of steel before he can act to protect his safety." *Id.* This does not, however, change the basic legal proposition that a weapons frisk requires balancing individual rights against the public interest in maintaining officer safety, *State v. Blakely,* 115 N.M. 466, 468, 853 P.2d 168, 170 (Ct.App. 1993), and that in striking this balance, the concern for officer safety must have some basis in the circumstances at hand. *See Vandenberg,* 2003–NMSC–030, ¶ 23, 134 N.M. 566, 81 P.3d 19 ("[W]e must balance the threat posed to officer safety *under the circumstances* " (emphasis added)). Thus, the weapons frisk was justified only if the officers had some specific, articulable safety concerns.

{13} In this case, the State presented no evidence of articulable safety concerns, nor did the trial court make findings of articulable safety concerns. The officers were responding to a dispatch regarding a suspicious parked car; they had no indication that a serious crime was in progress. *Cf. State v. Cobbs,* 103 N.M. 623, 628, 711 P.2d 900, 905 (Ct.App.1985) (in analyzing the necessity of a weapons frisk, observing that risk to officers "increases immeasurably when the officer is called upon to investigate a serious crime"). The trial court found that Defendant appeared dazed and did not respond verbally to the officers, but that he complied with the

request that he exit the car, and he complied with the request that he produce his driver's license. In addition, according to the testimony of Medrano, Defendant did not smell of alcohol, did not raise his voice, and did not threaten himself or the officers. *Cf. Blakely,* 115 N.M. at 469–70, 853 P.2d at 171–72 (finding that a weapons frisk was justified where the defendant called 911, volunteered that he had been injecting drugs, and threatened suicide). The officers ran a National Crime Information Center check that revealed no information about Defendant. *Cf. Vandenberg,* 2003–NMSC–030, ¶¶ 37–38, 134 N.M. 566, 81 P.3d 19 (taking into account that an officer had information from a "be-on-the-lookout bulletin" that contributed to his perception of safety concerns). The sole rationale offered for the search was Medrano's testimony that he considers any person with whom he comes into contact to be an unknown threat. Although this may be a prudent assumption, this assumption alone cannot justify a patdown. *See* 4 LaFave, *supra* § 9.5, at 254 ("The police are frequently cautioned to assume that every person encountered may be armed, which is sound advice if it means only that the officer should remain alert in every case; but it cannot mean and has not been interpreted by the police to mean that a search for weapons may be undertaken in every case."). In its findings and conclusions, the trial court adopted this erroneous rationale, stating that the patdown was justified because the officer did not know what he was dealing with. In striking the balance between personal privacy and officer safety, a general supposition that all citizens pose an unknown threat is not enough to tip the scales against the privacy of the individual. *See State v. Affsprung,* 2004–NMCA–038, ¶¶ 4, 15, 20, 135 N.M. 306, 87 P.3d 1088 (acknowledging legitimacy of officers' generalized concerns about their safety, but holding that such are insufficient to override Fourth Amendment privacy considerations).

{14} Nor do we believe that Defendant's lack of response to Medrano's question about weapons provided any articulable justification for the patdown. Medrano's question was not solely about weapons, and its ambiguity could likely have prevented Defendant from giving a response. Importantly, Medrano did not articulate the lack of response as a reason for the patdown. Therefore, Defendant's lack of response did not justify the patdown. Because the trial court misapplied the law to the facts, we reverse.

## CONCLUSION

{15} For the foregoing reasons we reverse the denial of the motion to suppress and remand for further proceedings consistent with this opinion.

{16} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and MICHAEL E. VIGIL, Judges.