IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMCA-130

Filing Date: October 16, 2009

Docket No. 28,821

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

v.

RAY ANTHONY MONTAÑO,

      Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY
John A. Dean Jr., District Judge

Gary K. King, Attorney General
Francine A. Chavez, Assistant Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Santa Fe, NM

for Appellant

OPINION

SUTIN, Judge.

{1}     Defendant Ray Anthony Montaño asserts that the district court erred in refusing to suppress drug-related evidence obtained from his person in a search incident to his arrest. Neither the record of the hearing nor the suppression order shows specific grounds for denial. The issue is whether the police officer's actions in stopping and questioning Defendant, who was on foot, and then obtaining Defendant's identification and running it through dispatch constituted an unlawful investigatory detention. The State acknowledges that the officer did not have reasonable suspicion of criminal activity up to the point that

1

dispatch informed the officer of an outstanding warrant. The State's position is that the circumstances constituted either a consensual community caretaker encounter excluded from the Fourth Amendment to the United States Constitution or a community caretaker encounter that was subject to, but reasonable under, the Fourth Amendment.

**{2}**     We hold under the Fourth Amendment that what started out as either a consensual or non-consensual community caretaker encounter became an unlawful investigatory detention. We therefore reverse the district court's denial of Defendant's motion to suppress the evidence obtained by the officer after the search incident to Defendant's arrest on the outstanding warrant.

## BACKGROUND

### The Testimony and Evidence

**{3}**     Officer Dennis Ronk was the only witness who testified at the suppression hearing. In addition, a portion of a dispatch communication was played along with a video. On June 5, 2007, at approximately 2:50 a.m., Officer Ronk was conducting a routine patrol through the back parking lot of a Super 8 Motel and saw Defendant running directly toward his vehicle. He thought Defendant was trying to flag him down. Defendant did not have a shirt on and his hand appeared to be bleeding. Officer Ronk stopped his vehicle. Defendant stopped running as he approached the officer's vehicle, and he was almost at a slow walk when he looked at Officer Ronk, but he then kept walking. Officer Ronk drove around the building because he did not know how Defendant had hurt his hand and because he had investigated several fights and domestic disturbances occurring at the local motels. He observed Defendant running across the parking lot of a closed business. Defendant had stopped running before Officer Ronk made contact with him. At the time of contact, Officer Ronk activated his vehicle's beam lights.

**{4}**     Officer Ronk testified that he may have said something like, "Hey come here, let me talk to you for a minute." It was obvious to the officer that Defendant's hand was bleeding to the extent that drops of blood were falling onto the ground. Officer Ronk asked Defendant where he was going. The officer used a flashlight as he approached Defendant for safety purposes and asked Defendant to keep his hands out of his pockets. Defendant gave the name of the street where his sister's house was located, and Officer Ronk knew the street was in the opposite direction of where Defendant was running. Officer Ronk requested Defendant to provide identification because he did not know if Defendant was intentionally being untruthful as to his destination or if he was incoherent, and the officer wanted to investigate further.

**{5}**     Defendant did not have any identification on him because he did not have a wallet. Officer Ronk asked Defendant for his name and date of birth. The officer testified that he asked Defendant for his identification (1) to see if he was involved in a domestic disturbance or a fight at the Super 8 Motel, and (2) to contact someone to pick him up because he might

2

be under the influence and confused as to his whereabouts. The officer agreed that his purpose "was simple identification" and confirmed that it was common among police officers to identify a person they are dealing with. Officer Ronk requested dispatch to run a "local's check." It was at that point when the officer asked Defendant how he had cut his hand, and Defendant stated that he cut it on a light bulb. In Officer Ronk's experience, people who smoke methamphetamine use light bulbs to ingest the drug.

**{6}** When the officer initially contacted dispatch, he reported there was a "subject walking around with no shirt." Dispatch's response then referred to a "1015" which translates to a "prisoner in custody." The officer agreed with defense counsel during his testimony that a "1015" translates to a "prisoner in custody."

**{7}** Officer Briseno arrived on the scene a few minutes into the encounter. Officer Ronk did not recall calling for backup and testified that dispatch might have sent backup on their own volition. Dispatch informed Officer Ronk that Defendant had an outstanding warrant for his arrest for failure to pay fines, and Officer Briseno placed Defendant under arrest. Officer Ronk then conducted a search of Defendant's person. The search yielded a clear, crystal-type substance which later tested positive for methamphetamine and also yielded a tool commonly used to ingest narcotics.

**{8}** Defendant was charged in count one with possession of a controlled substance (methamphetamine) contrary to NMSA 1978, Section 30-31-23(D) (2005), a fourth degree felony, and was charged in count two with possession of drug paraphernalia, contrary to NMSA 1978, Section 30-31-25.1(A) (2001), a misdemeanor. Defendant filed a motion to suppress all the evidence seized on the ground that there was no reasonable suspicion to conduct an investigatory stop. The State filed a response to the motion and argued that the officer was acting under the community caretaker function.

**{9}** After a hearing on the suppression motion, the district court denied Defendant's motion. Defendant entered into a conditional plea reserving his right to appeal the denial of the motion to suppress. Pursuant to the plea agreement, count two was dismissed. Defendant was sentenced on count one.

**{10}** On appeal, Defendant asserts that he was seized in violation of the Fourth Amendment to the United States Constitution and also in violation of Article II, Section 10 of the New Mexico Constitution because the officer conducted an investigatory stop without reasonable suspicion that Defendant was involved in criminal activity.

**DISCUSSION**

**Standard of Review**

**{11}** "The standard of review for suppression rulings is whether the law was correctly applied to the facts, viewing them in a manner most favorable to the prevailing party." *State*

*v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856 (internal quotation marks and citation omitted). This Court must "observe the distinction between factual determinations which are subject to a substantial evidence standard of review and application of law to the facts[,] which is subject to de novo review." *State v. Nieto*, 2000-NMSC-031, ¶ 19, 129 N.M. 688, 12 P.3d 442 (alteration in original) (internal quotation marks and citation omitted). This Court must defer to the district court with respect to findings of historical fact as long as they are supported by substantial evidence. *Jason L.*, 2000-NMSC-018, ¶ 10.

> Our review of a district court's decision regarding a motion to suppress evidence involves mixed questions of fact and law. In reaching our conclusion, we adopt an interpretation of the factual background that is most favorable to the prevailing party, as long as the facts are supported by substantial evidence. Against such a factual backdrop, we evaluate de novo the reasonableness of the conduct of law enforcement officers, considering the totality of the circumstances

*State v. Gutierrez*, 2008-NMCA-015, ¶ 4, 143 N.M. 522, 177 P.3d 1096 (filed 2007) (internal quotation marks and citations omitted).

> The determination of a seizure has two discrete parts: (1) what were the circumstances surrounding the stop, including whether the officers used a show of authority; and (2) did the circumstances reach such a level of accosting and restraint that a reasonable person would have believed he or she was not free to leave? The first part is a factual inquiry, which we review for substantial evidence. The second part is a legal inquiry, which we review de novo.

*Jason L.*, 2000-NMSC-018, ¶ 19.

**The Parties' Positions**

{12}    The State argues that because the district court made no findings of fact, we are to "indulge in all reasonable presumptions in support of the district court's ruling." *State v. Gonzales*, 1999-NMCA-027, ¶ 15, 126 N.M. 742, 975 P.2d 355 (filed 1998). The State's primary contention is that the encounter was consensual during a community caretaker function and, therefore, the encounter did not implicate the Fourth Amendment. In support of this justification, the State argues that, under the totality of the circumstances, the encounter was consensual because Defendant was free to decline the officer's requests and to terminate the encounter and leave. *See State v. Morales*, 2005-NMCA-027, ¶ 10, 137 N.M. 73, 107 P.3d 513 (filed 2004); *State v. Walters*, 1997-NMCA-013, ¶ 12, 123 N.M. 88, 934 P.2d 282 (filed 1996). The State also argues that the officer did not convey by physical force or show of authority that Defendant was not free to walk away. *See Gutierrez*, 2008-NMCA-015, ¶ 9. The State argues further that the mere request for identification and other

questioning does not turn a consensual encounter into a seizure. *See Walters*, 1997-NMCA-013, ¶ 18.

**{13}** The State's alternative justifications for the officer's actions are based on the community caretaker-public service and the emergency aid exceptions to the Fourth Amendment's warrant requirement. *See State v. Ryon*, 2005-NMSC-005, ¶¶ 25-26, 137 N.M. 174, 108 P.3d 1032 (setting out "three distinct doctrines under the community caretaker exception [that] have emerged," two of which are (1) "the community caretaking doctrine, or public servant doctrine," and (2) "the emergency aid doctrine"). In support of the community caretaker-public service exception, the State argues that Defendant's privacy interest was considerably less than if he were in a home or vehicle and that in measuring "the public need and interest furthered by the police conduct against the degree of and nature of the intrusion upon the privacy of the citizen" the warrantless seizure of Defendant was reasonable. *See id.* ¶¶ 16, 24-26 (recognizing that warrants and reasonable suspicion are not required where the police are engaged in activities that are unrelated to crime-solving and that "[a]s the privacy expectation increases, the caretaker functions that justify an intrusion by police must be judged by a different standard") (internal quotation marks and citation omitted).

**{14}** In support of the emergency aid exception, the State addresses two pertinent elements of a three-part test adopted by our Supreme Court. *See id.* ¶¶ 29-39 (adopting the three-part test from *People v. Mitchell*, 347 N.E.2d 607 (N.Y. 1976), *abrogated by Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006)). One element of the test requires that there exist reasonable grounds to believe there is an emergency and an immediate need for assistance. *Ryon*, 2005-NMSC-005, ¶ 29. The State argues that "[t]ested objectively under the totality of circumstances, Office[r] Ronk had reasonable grounds to believe that Defendant was in need of assistance." The second element of the test involves the officer's primary motivation. *See id.* The State argues that the officer's primary motivation "was to determine if Defendant was in need of assistance and to render any assistance that was necessary." *See id.* ¶¶ 29, 36 (adopting the *Mitchell* primary-motivation standard and discussing what must be demonstrated under the standard). The State attempts to stay within *Ryon*'s requirement, as quoted by the State from *Ryon*, 2005-NMSC-005, ¶ 36, that "[t]he protection of human life or property in imminent danger must be the motivation for the [initial decision to enter the home] rather than the desire to apprehend a suspect or gather evidence for use in a criminal proceeding." (Emphasis omitted.) (Second alteration in original.) (Internal quotation marks and citation omitted.) Yet, the State pieces together the officer's concern as to Defendant's truthfulness and coherence, and his later concern as to substance influence and use, to argue that the circumstances "arouse[d] suspicions of potential criminal conduct [that made it] wholly reasonable for the officer to investigate further." According to the State, "it [was] not realistic for officers to completely abandon this investigative function." *See id.* (stating "[w]hile we do not believe it is realistic to completely abandon their investigative function, we adopt the 'primary motivation' standard set out in *Mitchell*").

**{15}** Defendant asserts that the officer asked Defendant to stop and "immediately began asking him questions designed to determine why he was in the parking lot, specifically where he was going and whether he was involved in a domestic violence incident or using methamphetamine[]." Defendant argues that this constituted a show of force, conveyed that compliance with the requests was required and that, under the totality of circumstances, a reasonable person in Defendant's position would not feel free to leave. Defendant also argues that the facts show that Officer Ronk did not approach Defendant to engage in community caretaking under either the public service or the emergency aid doctrine.

**{16}** With respect to the community caretaker-public service doctrine, Defendant argues that the circumstances showed that the officer "did not approach the situation in a manner that indicated his purpose was anything other than an investigation into possible criminal conduct." With respect to the emergency aid doctrine, Defendant argues that Officer Ronk did not have a reasonable ground to believe that there was an emergency at hand and an immediate need for his assistance for the protection of life or property. *See id.* ¶ 29 (stating that under the emergency aid doctrine the prosecution must establish that "the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property" (internal quotation marks and citation omitted)). According to Defendant, the circumstances demonstrated nothing more than that the officer saw Defendant shirtless and running through a parking lot with a bleeding hand in the middle of the night before the officer stopped him. Defendant also argues that the officer did not have a primary motivation to protect one in immediate danger and assist without delay, but rather that the officer's intent was to detain Defendant and investigate the reasons for his presence in the parking lot. Defendant points out that the officer did not ask Defendant if he was all right or needed medical attention, and at no time did the officer express any interest in Defendant's welfare as would be expected of an officer acting in a community caretaker role. Thus, Defendant asserts that the officer's primary motivation was investigation of possible criminal activity and not community caretaking.

**The Circumstances Indicate an Investigative Detention Without Reasonable Suspicion**

**{17}** Under the circumstances in this case, at least once the officer requested and obtained Defendant's identification, any consensual encounter that arguably existed ceased. Defendant was not free to leave. *See Jason L.*, 2000-NMSC-018, ¶ 14 (stating that the officer may not "convey a message that compliance with their requests is required" (internal quotation marks and citation omitted)). In regard to the Fourth Amendment detention issue, it is somewhat difficult to parse out the officer's conduct and motivation. It is not unreasonable to conclude that the officer's initial thoughts and actions, when he first saw Defendant running and then walking toward the police car, could have been consistent with a view that the officer was concerned about Defendant's welfare. The circumstances that followed, when the officer followed Defendant and saw him running in the parking lot of a closed business, through the point that the officer caught up with Defendant, got out of his car, and asked Defendant why he was there, where he was going, and whether he had any

6

identification, altogether create an unclear picture as to whether the officer was acting on a reasonable belief that Defendant needed medical assistance.

**{18}**     Officer Ronk's testimony that he drove around the building because he did not know how Defendant had hurt his hand and the questioning that followed could be construed as an interest in investigating possible criminal conduct.  However, viewing those particular circumstances in a light favorable to the district court's ruling in this case, we conclude that the officer's actions arguably remained consistent with a view that the officer continued to be primarily concerned about Defendant's welfare.

**{19}**     It quickly became clear, however, that the officer wanted to determine if Defendant had been involved in a domestic disturbance in the vicinity, a fight at the motel, or some other possibly unlawful activity, when the officer obtained and gave Defendant's name and date of birth to dispatch.  The officer then inquired about where Defendant got the blood on his hand.  Defendant's response that he injured his hand on a light bulb heightened the officer's suspicions, based on the officer's knowledge that people who smoke methamphetamine use light bulbs for that purpose. Following this inquiry of Defendant, the officer learned from dispatch that there was an outstanding warrant for Defendant's arrest for unpaid traffic fines, and the officer arrested Defendant.  The State has not demonstrated that, at the time the officer obtained Defendant's identification, a public need and interest existed for Defendant's detention that outweighed the intrusion into Defendant's privacy.

**{20}**     We are struck by the officer's complete failure during the entire time up to Defendant's arrest to inquire regarding Defendant's physical or mental condition or to act in a way that would indicate any concern for Defendant's welfare including, in particular, if Defendant was in need of medical assistance or assistance from others in getting to a location where he could receive help or otherwise be safe.  The sequence of events shows a movement from conduct motivated by a skeptical concern for welfare to conduct motivated by a hunch about criminal activity based on which the officer investigated Defendant through dispatch.  At no time was there an emergency requiring the officer's intrusion into Defendant's privacy, a fact the State carefully refrains from stating in its answer brief.

**{21}**     We recognize that, as the State points out, in some cases an officer may approach an individual and ask questions without the encounter becoming a seizure under the Fourth Amendment.  *See Gutierrez*, 2008-NMCA-015, ¶ 9 ("Law enforcement officers generally need no justification to approach private individuals on the street and ask questions.").  But here, what might at the outset have been a consensual encounter or a community caretaker concern for welfare was transformed into an encounter that was not consensual as well as into one in which the officer demonstrated a primarily, if not solely, criminal investigative purpose.  *See Ryon*, 2005-NMSC-005, ¶ 20 (holding that it was error in *Jason L.* to characterize community caretaker encounters as a voluntary or consensual encounters that are beyond the scope of the Fourth Amendment, and stating that the reasonableness of an officer's conduct in a purported community caretaker activity "depends on whether the legal

7

standards that justify the community caretaker exception are satisfied" which, in turn, "depends on particular facts, which may or may not involve a consensual encounter").

**{22}** We fail to see how any initial community caretaker encounter and activity continued into and trumped the officer's investigatory purpose and activity. *See Gutierrez*, 2008-NMCA-015, ¶ 14 (stating that "[d]espite the officers' initial intent to merely ask [the d]efendant a few questions, the encounter quickly escalated into an investigatory detention"). We hold that Defendant was unlawfully detained and that the evidence obtained from Defendant after he was arrested should have been suppressed. *See State v. Garcia*, 2009-NMSC-046, ¶ 1, ___ N.M. ___, ___ P.3d ___ (holding that evidence obtained against the defendant was the fruit of an unreasonable seizure and therefore must be suppressed).

**The State Constitution**

**{23}** Defendant requests this Court to provide him greater protection against unlawful searches and seizures by providing relief under Article II, Section 10 of the New Mexico Constitution, should we deny relief under the Fourth Amendment. *See State v. Gomez*, 1997-NMSC-006, ¶¶ 22, 33-40, 122 N.M. 777, 932 P.2d 1 (setting out the proof required to invoke protection under the New Mexico Constitution). Because we reverse Defendant's conviction based on a Fourth Amendment violation, we need not address whether we should apply our State Constitution to the circumstances. Were we to do so, however, we doubt that we would have any hesitation in holding that under Article II, Section 10 the detention was unlawful and the evidence should have been suppressed. *See Garcia*, 2009-NMSC-046, ¶¶ 1, 41, 44, 47 (holding that "[the d]efendant was seized . . . when the officer stopped his patrol car . . . near where [the d]efendant was walking, shone his spotlight on [the d]efendant, and told him to stop" and stating that "[b]ecause there was no reasonable suspicion to support seizing [the d]efendant, the evidence obtained against him was the fruit of an unreasonable seizure under Article II, Section 10 and must be suppressed").

**CONCLUSION**

**{24}** We reverse the district court's denial of Defendant's motion to suppress.

**{25}** **IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**CELIA FOY CASTILLO, Judge**

8

_____
**ROBERT E. ROBLES, Judge**

**Topic Index for** *State v. Montano*, **No. 28,821**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-FA | Fourth Amendment |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-CL | Controlled Substances |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-AE | Arrest Warrant |
| CA-RS | Reasonable Suspicion |
| CA-SZ | Search and Seizure |
| CA-SI | Search Incident to Arrest |
| | |
| **EV** | **EVIDENCE** |
| EV-SU | Suppression of Evidence |