This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.                             **NO. 29,632**

**MARK JIMENEZ**,

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**Thomas A. Rutledge, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
Jacqueline R. Medina, Assistant Attorney General
Albuquerque, NM

for Appellee

Jacqueline L. Cooper, Acting Chief Public Defender
Eleanor Brogan, Assistant Appellate Defender
Santa Fe, NM

for Appellant

### MEMORANDUM OPINION

**VANZI, Judge.**

Defendant Mark Jimenez appeals his convictions of attempted possession of methamphetamine, as defined by NMSA 1978, Section 30-31-23(D) (2005), and possession of drug paraphernalia, as defined by NMSA 1978, Section 30-31-25.1(A) (2001). Defendant contends that he was illegally seized during his encounter with the police, and thus, the evidence obtained as a result of the encounter should have been suppressed. We agree and reverse his convictions. Because we reverse based on the illegal seizure, we do not reach Defendant's argument that his right to confrontation was violated.

**BACKGROUND**

The following facts are taken from testimony at the April 11, 2008, hearing on Defendant's motion to suppress and from the district court's findings of fact and conclusions of law. On November 30, 2006, in Artesia, New Mexico, an anonymous caller called 911 and stated that someone at the Jaycee Park needed help and then hung up. The caller provided no additional information; however, Officers Silvas and Horrell, who were in two separate vehicles, were dispatched to the area to respond to the call.

After initially driving through part of the park without seeing anyone, the officers noticed a Chevy Camaro parked with its lights and engine off. The officers pulled up to the car, and each shined a spotlight toward the middle of the car. Officer

Silvas got out of his car and approached the driver, Tommy Briscoe, while Officer Horrell approached Defendant on the passenger side. Through the driver-side window, which was cracked about four to five inches, Officer Silvas asked Tommy, "What are you guys doing?" Tommy said that they were "just chilling" and that there was "nothing" going on. Officer Silvas then asked Tommy to step out of the car. When Tommy got out of the car, he left his door open. Officer Horrell also had Defendant step out of the car.

After both Defendant and Tommy went to the rear of the car, they were patted down for weapons, and Officer Silvas started back towards the driver's side of the car, while Officer Horrell remained with Defendant and Tommy. Officer Silvas shined his flashlight into the car from the open driver-side door, and he saw a dinner plate sticking half-way out from underneath a seat. On the plate was a white, powdery substance. He removed the plate from the car, placed it on the roof of the car, and asked Tommy what was on the plate. Tommy said that it was "his brother's experiment." The officers then called for a narcotics officer. The narcotics officer sent the contents of the plate, as well as other evidence he collected in a more thorough search of the car, to the crime lab to be tested. The test results showed that there were over thirteen grams of methamphetamine in the car.

Defendant was charged with trafficking a controlled substance, contrary to NMSA 1978, Section 30-31-20(A)(2)(c) (2006), and possession of drug paraphernalia, in violation of Section 30-31-25.1(A). He filed a motion to suppress the evidence obtained as a violation of his rights under Article II, Section 10 of the New Mexico Constitution. The district court denied his motion. At trial, Defendant was convicted of both possession of drug paraphernalia and attempted possession of methamphetamine. Defendant appeals his convictions.

On appeal, Defendant argues that the police illegally detained him and that the evidence discovered should have been suppressed because it was the result of his illegal detention. Defendant also argues that his right to confrontation was violated and that the "collusion between Sergeant Haskins and the lab analyst constitute[d] outrageous government behavior." As we have noted, we do not reach these latter two issues.

**DISCUSSION**

**Standard of Review**

Defendant contends that his motion to suppress should have been granted because he was detained in violation of both the Fourth Amendment of the United States Constitution and Article II, Section 10 of the New Mexico Constitution. At the outset, we note that Defendant properly preserved his argument that Article II, Section

4

10 affords him greater protections than the Fourth Amendment. Defendant asserted that his state constitutional rights were violated both in his motion to suppress and by developing a factual record at the hearing on his motion. *See State v. Leyva*, 2011-NMSC-009, ¶ 48-49, 149 N.M. 435, 250 P.3d 861 (concluding that, where our Article II, Section 10 constitutional provision has already been interpreted to provide greater protection than its federal counterpart, a defendant must develop a factual record and raise the applicable constitutional provision to the district court to preserve his Article II, Section 10 claim).

Turning to the standard of review, a district court's decision to deny a motion to suppress is a mixed question of law and fact. *State v. Ketelson*, 2011-NMSC-023, ¶ 9, ___ N.M. ___, 257 P.3d 957. While we review the district court's legal conclusions de novo, we will not disturb the district court's factual findings if they are supported by substantial evidence. *State v. Leyba*, 1997-NMCA-023, ¶ 8, 123 N.M. 159, 935 P.2d 1171. "[T]he facts [are] viewed in the manner most favorable to the prevailing party." *State v. Brennan*, 1998-NMCA-176, ¶ 10, 126 N.M. 389, 970 P.2d 161.

**Defendant Has Standing to Raise the Motion to Suppress**

As a threshold matter, we must first determine whether Defendant has standing to seek suppression of the evidence obtained from the car. The State argues that

Defendant, as a mere passenger, does not have standing to contest the search of the car. The State relies on *State v. Waggoner*, 97 N.M. 73, 75, 636 P.2d 892, 894 (Ct. App. 1981), in which we held that passengers in a vehicle, who were only getting a ride from the driver and did not own the vehicle, did not have a legitimate expectation of privacy in the vehicle and thus, did not have standing to challenge the validity of a search of the vehicle.

However, this Court recently clarified the *Waggoner* line of cases and concluded that while a passenger lacks standing to challenge the search of a vehicle, he nonetheless has standing to seek suppression of evidence obtained as a result of his own illegal detention. *State v. Portillo,* 2011-NMCA-079, ¶¶ 11, 32, __ N.M. ___, ___ P.3d ___, *cert. denied*, 2011-NMCERT-006, ___ N.M. ___, ___ P.3d ___; *see State v. Sewell*, 2009-NMSC-033, ¶ 16, 146 N.M. 428, 211 P.3d 885 (explaining that a defendant has "standing to object to a seizure from a third person which occurred as a result of the exploitation of [the d]efendant's own unlawful detention." (alteration, internal quotation marks, and citation omitted)), *cert. denied*, 2010-NMCERT-001, 147 N.M. 673, 227 P.3d 1055. Thus, any evidence obtained as the result of the passenger's illegal detention is fruit of the poisonous tree and must be suppressed. *See Portillo*, 2011-NMCA-079, ¶ 32 (stating that evidence discovered after an illegal detention of passenger/defendant was subject to suppression as fruit

of the poisonous tree); *State v. Cardenas-Alvarez*, 2000-NMCA-009, ¶ 25, 128 N.M. 570, 995 P.2d 492 ("Evidence obtained must be suppressed if it is the fruit of an illegal detention."), *aff'd*, 2001-NMSC-017, 130 N.M. 386, 25 P.3d 225. Defendant here has standing to challenge the lawfulness of his own detention and to seek to suppress the evidence found as a result.

**Defendant Was the Subject of an Investigative Detention That Was Not Supported by Reasonable Suspicion of a Crime**

The district court found that the investigative detention began once the officers approached the car, ordered Defendant and Tommy to show their hands, and commanded them to get out of the car. For the reasons that follow, we agree with the district court.

An investigative detention "must be reasonably related to the circumstances that initially justified the stop, and the scope of the investigation may expand only when the officer has reasonable and articulable suspicion of other criminal activity." *State v. Patterson*, 2006-NMCA-037, ¶ 16, 139 N.M. 322, 131 P.3d 1286 (internal quotation marks and citation omitted). Here, Defendant and Tommy were seized at the point that they were commanded to show their hands and step out of the car. *See State v. Eric K.*, 2010-NMCA-040, ¶ 20, 148 N.M. 469, 237 P.3d 771 (concluding that at the point the officer requested or commanded the defendant to show his hands, the defendant was seized because the officer's show of authority was such that a

7

reasonable person in the situation would not have felt free to leave); *State v. Boblick*, 2004-NMCA-078, ¶ 10, 135 N.M. 754, 93 P.3d 775 (concluding that "a reasonable person would [not] feel free to leave after officers knocked on his car window, asked him to exit the vehicle, and questioned him about weapons" and that at the point the officer "asked [defendant] to get out of the car and began questioning him, the encounter resembled an investigatory detention more than it did a welfare check"). Furthermore, Officer Horrell described the detention as a felony take down.

We first determine whether the investigative detention itself was justified. If it was not, we then look to whether any exceptions existed to support the officers' actions. We conclude that the investigative detention in this case was not justified because the officers did not articulate any specific facts at the hearing on the motion to suppress that would have supported a conclusion that the officers had reasonable suspicion of a crime. *See Eric K.*, 2010-NMCA-040, ¶ 21 (stating that the officer had to have "articulable, reasonable suspicion that [the defendant] had engaged in criminal activity in order for the officer to initiate . . . an investigatory detention of [the defendant]"). In fact, the officers provided no testimony during the hearing that Defendant and Tommy were breaking or had broken the law. *See State v. Jason L.*, 2000-NMSC-018, ¶ 20, 129 N.M. 119, 2 P.3d 856 (stating that "[r]easonable suspicion must exist at the inception of the seizure" and it "is a particularized

8

suspicion . . . that a particular individual, the one detained, is breaking, or has broken, the law"). To the contrary, Officer Silvas testified that he did not suspect that Tommy was committing a crime and that he did not have a reason to believe there was a crime in progress at the park. As a result, the investigative detention was illegal, and the evidence should have been suppressed unless it was otherwise justified. *See State v. Wagoner*, 2001-NMCA-014, ¶¶ 29-30, 130 N.M. 274, 24 P.3d 306 (explaining that evidence obtained by some illegality is to be excluded or suppressed under the exclusionary rule and that under the New Mexico Constitution, the party is returned to the position he would have been in had the right not been violated); *State v. Ledbetter*, 88 N.M. 344, 346, 540 P.2d 824, 826 (Ct. App. 1975) (concluding that marijuana discovered after police officers ordered the defendants out of a car was a search that was illegal because the officers did not have a warrant, and the circumstances surrounding the search did not meet any of the exceptions to the warrant requirement).

**The Police Were Not Engaged in Their Role as Community Caretakers During the Encounter With Defendant**

Concluding that the investigatory detention was not supported by reasonable suspicion of a crime, we next turn to whether Defendant's detention was justified by the community caretaking exception to the Fourth Amendment. The district court concluded that the "[c]ommunity [c]aretaker duty of the [p]olice was relevant to their

actions[,] and they were reasonable in discerning the number of occupants of the vehicles as well as their physical well being and taking appropriate steps for officer safety." We disagree.

The Fourth Amendment of the United States Constitution and Article II, Section 10 of the New Mexico Constitution provide that a person has a right to be free from unreasonable searches and seizures where the person has a constitutionally recognized expectation of privacy in the thing being searched or seized. *Leyva*, 2011-NMSC-009, ¶ 1; *State v. Ryon*, 2005-NMSC-005, ¶ 23, 137 N.M. 174, 108 P.3d 1032. Although the Fourth Amendment and Article II, Section 10 generally require reasonable suspicion for investigatory detentions, "[t]he community caretaker exception recognizes that . . . reasonable suspicion [is] not required when police are engaged in activities that are unrelated to crime-solving." *Ryon*, 2005-NMSC-005, ¶ 24. When police are engaged in a community caretaking capacity, the officers are "motivated by a desire to aid victims rather than investigate criminals." *Id*. ¶ 25 (internal quotation marks and citation omitted).

Three distinct doctrines have emerged under the community caretaker exception, two of which are relevant here. *See id*. ¶ 25 (setting forth the three different doctrines within the community caretaking exception). The two pertinent ones are the public servant doctrine, also sometimes referred to simply as the

10

community caretaking doctrine, and the emergency assistance doctrine. *Id.* ¶ 25. Under the public servant doctrine, officers must demonstrate "a specific, and articulable concern for public safety requiring the officer's general assistance." *Id.* ¶ 26. The primary characteristic of the public servant doctrine "is the absence of concern by police about violations of the law." *Id.* ¶ 21. Accordingly, "we must measure the public need and interest furthered by the police conduct against the degree of and nature of the intrusion upon the privacy of the citizen" to determine when a "warrantless search or seizure is reasonable on the basis of the community caretaker exception[.]" *Id.* ¶ 24 (internal quotation marks and citation omitted). The emergency assistance doctrine, on the other hand, applies to seizures when police reasonably believe that a person is in need of immediate aid to protect or preserve life or avoid serious injury, and the scope of the seizure is strictly limited to that purpose. *Id.* ¶ 29. It is a separate doctrine from the exception for exigent circumstances that also excuses the need for a warrant. *Id.* ¶ 26, n.4. Consequently, when acting in such a role, "the officer may not do more than is reasonably necessary to determine whether a person is in need of assistance, and to provide that assistance." *Id.* ¶ 29 (internal quotation marks and citation omitted). We observe that while we have generally analyzed the emergency assistance doctrine in the context of warrantless home entries, this Court has considered the doctrine in other contexts as well. *See State v. Montaño*,

2009-NMCA-130, ¶¶ 16, 20, 147 N.M. 379, 223 P.3d 376 (discussing the emergency assistance doctrine and holding that there was no "emergency requiring the officer's intrusion into [the d]efendant's privacy" in a case where an officer saw the defendant running toward his vehicle with no shirt on and his hand bleeding). We begin with the public servant doctrine and then turn to the emergency assistance doctrine.

Based on our review of the record, we conclude that the public servant doctrine does not justify the officers' actions in this case. Here, the officers only had generalized, nonspecific information that someone at the Jaycee Park needed help. *See Apodaca v. State, Taxation & Revenue Dep't,* 118 N.M. 624, 626, 884 P.2d 515, 517 (Ct. App. 1994) (stating that in their role as public servants, police officers can act upon a "specific, articulable safety concern" to justify their actions). They did not know the identity or gender of the caller. They did know what kind of situation created the need for "help." And they did not know what kind of "help" was needed. The officers did not articulate anything more than a generalized response to a vague 911 call. Further, they did not inquire further about Defendant's or Tommy's welfare before having them get out of the car or ask if Defendant was in need of medical assistance or assistance from others. *See Montaño,* 2009-NMCA-130, ¶¶ 13, 19 (stating that the state must demonstrate that the public need and interest furthered by the police conduct must outweigh the intrusion into the defendant's privacy and

12

concluding that the state did not demonstrate that there was a public need or interest that outweighed the intrusion of asking the defendant for identification). Consequently, we conclude that an unspecified, general call for "help" at the park did not amount to an emergency requiring the officer's intrusion into Defendant's privacy.

We next consider whether the officers could have been acting in their capacity as community caretakers through the emergency assistance doctrine. Our Supreme Court has established a three-part test when applying the emergency assistance doctrine. *Ryon*, 2005-NMSC-005, ¶ 29. The first prong is an objective standard that the officers "must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property." *Id.* (internal quotation marks and citation omitted). The second is a subjective test and under the third prong, the court must determine that the search or seizure is "strictly circumscribed by the exigencies which justify its initiation." *Id.* ¶¶ 33, 38 (internal quotation marks and citation omitted). It is the State's burden to establish all of the elements. *Id.* ¶ 29.

In this case, the State fails to meet even the first prong of the emergency assistance doctrine that requires "a strong perception that action is required to protect against imminent danger to life or limb[.]" *Id.* ¶ 31. In *Ryon*, our Supreme Court listed some of the factors that the court should consider when analyzing whether the

emergency assistance doctrine applies, including "the purpose and nature of the dispatch, the exigency of the situation based on the known facts, and the availability, feasibility[,] and effectiveness of alternatives to the type of intrusion actually accomplished." *Id.* ¶ 32 (internal quotation marks and citation omitted). We assume, without deciding, that the officers' initial response of traveling to the park may have met the first prong of the emergency assistance doctrine test because a 911 call can presumably indicate that an emergency is at hand and that someone needs immediate assistance to protect their life or property. However, once the officers reached the park and approached Tommy's car, there were no facts indicating that Tommy or Defendant was involved in an emergency. When Officer Silvas first asked what Tommy and Defendant were doing in the park, Tommy answered that he and Defendant were "just chilling." Such a response did not indicate that any emergency was at hand or that Defendant, Tommy, or anyone else was in need of immediate assistance. *See id.* ¶¶ 26-27 (emphasizing the strong sense of urgency required of the police to justify a warrantless entry into a home under the emergency assistance doctrine); *Montaño*, 2009-NMCA-130, ¶ 20 (noting that this Court was "struck by the officer's complete failure" to determine whether the defendant was in need of medical assistance or to get to a place where he could receive assistance). Rather than asking Defendant and Tommy if there were any other people in the car or if anyone

14

needed help, which would have allowed them to determine if there was anyone in need of their assistance, the officers—relying only on the vague information from the call—immediately ordered Defendant and Tommy to get out of the car and patted them down for weapons. *See Boblick*, 2004-NMCA-078, ¶ 11 (noting that weapons frisks are distinct from welfare checks under the community caretaking function and "the officer must have a sufficient degree of articulable suspicion that the person being frisked is both armed and presently dangerous" to justify the frisk (emphasis, internal quotation marks and citation omitted)). Thus, we conclude that Officers Silvas and Horrell did more than was reasonably necessary to determine if Defendant, Tommy, or someone else was in need of assistance. *See Ryon*, 2005-NMSC-005, ¶¶ 42-43 (concluding that officers did not act as reasonable community caretakers when they entered a home based on only generalized, nonspecific information that Defendant might be inside and that he might have been injured). The district court erred in finding that either of the pertinent community caretaker exceptions applied to the facts in this case.

**The District Court Erred in Denying Defendant's Motion to Suppress Because the Evidence Was Discovered as a Result of His Own Unlawful Detention**

Because we have concluded that Defendant was unlawfully detained and that no exceptions apply, we turn to the question of whether the evidence was obtained as a result of the "the exploitation of Defendant's own unlawful . . . detention[.]" *See State v. Hernandez*, 1997-NMCA-006, ¶ 17, 122 N.M. 809, 932 P.2d 499. In other words, we consider whether evidence obtained from a search or seizure of a third person and discovered after a defendant's own unlawful detention must be suppressed.

This Court has addressed the issue in two factually similar cases. In *Portillo*, 2011-NMCA-079, ¶¶ 32-33, we held that evidence obtained in the search of a vehicle in which the defendant was a passenger after the police illegally detained the defendant by way of improper questioning, was subject to suppression. Similarly, in *Hernandez*, 1997-NMCA-006, ¶¶ 16-17, we concluded that evidence discovered in a search of the defendant's daughter after the defendant's car had been stopped had to be suppressed as the fruit of the defendant's own illegal arrest. Thus, our broad interpretation of Article II, Section 10 protects vehicle passengers from "flagrantly illegal" action by police officers. *Portillo*, 2011-NMCA-079, ¶ 32 (internal quotation marks and citation omitted). Furthermore, "once the occupants of [a] vehicle have established that their detention . . . was illegal, . . . any evidence obtained as a result of their detention must be excluded as fruit of the poisonous tree" because that evidence is the exploitation of a defendant's own unlawful detention. *Id.* ¶ 29

16

(internal quotation marks and citation omitted); *Sewell*, 2009-NMSC-033, ¶ 16 (providing standing to a defendant to seek suppression of evidence that was the "result of the exploitation of [the d]efendant's own unlawful detention." (alteration, internal quotation marks, and citation omitted)).

Here, it is clear that Defendant was the subject of an illegal detention. Without reasonable suspicion of a crime, the officers required Defendant and Tommy to get out of the vehicle where they were both held by Officer Horrell near the back of the car, while Officer Silvas returned to the car and noticed the plate. The officers would not have found the plate or other narcotic substances in the car if they had not detained Defendant and Tommy. The evidence was found as a result of both Defendant and Tommy being outside of the vehicle. *See Hernandez*, 1997-NMCA-006, ¶¶ 29, 33 (concluding that the district court should have suppressed evidence of narcotics found on the defendant's daughter's person in a strip search following an investigatory stop that turned into a de facto arrest unsupported by probable cause). Based on the foregoing, we hold that the community caretaker exception does not apply in this case, and under the Fourth Amendment, the evidence obtained by the police was the fruit of Defendant's unlawful investigatory detention, as such, it should have been suppressed.

**CONCLUSION**

17

We reverse Defendant's convictions as they were based on evidence that should have been suppressed.

**IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**CYNTHIA A. FRY, Judge**

_____
**RODERICK T. KENNEDY, Judge**