**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-040**

**Filing Date: April 1, 2010**

**Docket No. 28,583**

**STATE OF NEW MEXICO,**

       **Plaintiff-Appellee,**

**v.**

**ERIC K.,**

       **Child-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**Sandra A. Price, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
M. Anne Kelly, Assistant Attorney General
Albuquerque, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Navin H. Jayaram, Assistant Appellate Defender
Carlos Ruiz de la Torre, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**SUTIN, Judge.**

**{1}** This is another Fourth Amendment seizure case that arrives at our doorstep for development of the law of reasonable suspicion involving an extended detention of a person on foot who happens to be in the area of possible criminal activity reported in an anonymous 911 call. Upon being dispatched to an area of reported criminal activity, a police officer attempted an encounter with Eric K. (Child) and a companion as they were about to enter a Laundromat located in the vicinity of a reported crime. Child first ignored the officer's

1

summon and entered the Laundromat but then complied upon the officer's second summon, after which the officer on more than one occasion told Child to remove his hands from the pockets of his jacket. After Child's hands were out of his jacket pockets, the officer noticed something about the pockets that indicated to the officer that Child may have a weapon. The officer conducted a patdown and discovered drug paraphernalia, drugs, and a weapon. After he was arrested and charged, Child sought suppression of the evidence on the ground he was seized without the requisite reasonable suspicion. The district court denied Child's motion to suppress as to the weapon and the drug paraphernalia. We reverse.

## BACKGROUND

{2}     A 911 caller who identified himself as Johnny Smith reported that someone, referred to in the conversation with dispatch as "she," pulled a gun and took his money apparently during a drug transaction in the vicinity of Tibbetts Middle School in Farmington, New Mexico. When the 911 call was suddenly dropped, dispatch called the reporting party back asking for Johnny Smith, and a female named "Keisha Red" answered, indicated that she was talking on a cell phone, and stated that "There's no Johnny here" and that "[h]e left walking down the street."

{3}     The dispatcher relayed information to Officer Mark Gaines. The information relayed was that there was an "armed subject" in the area of the school and named "Johnny Smith" as the party who reported to dispatch that someone just pulled a gun on him when "buying Code 12." The dispatcher did not mention that the reporting party indicated that the assailant was female. The officer testified that he had no other description of the 911 caller, had no description of the person with the gun, and did not have a specific location where the reported incident occurred when he proceeded to the area. It was mid-afternoon on a day when the school was closed for Christmas break.

{4}     Approximately two blocks from the school, Officer Gaines observed two males walking toward the back door of a Laundromat. There were a few other people in the Laundromat parking lot but "nobody walking." The officer was looking for people on foot "that could be a danger." The officer was concerned about community safety given the report that someone had pulled a gun on someone, and the officer intended to ask the two males if they knew anything about what had happened, to see if they had heard or seen anything, and to ascertain if they might be a suspect. The two looked "a little bit nervous" to the officer, and he decided to contact them without really knowing "where it was gonna go at that point."

{5}     When they saw the officer, the two persons moved quickly to the Laundromat, whereupon the officer hollered for them to talk to him. One of the two persons, Child, darted quickly into the Laundromat; his companion, whom Child testified was his cousin, approached the officer. The officer "yelled-hollered-asked" Child to come out and to come over to talk to the officer, and Child came out of the Laundromat. The officer saw nothing incriminating in the conduct of the two at this point.

2

**{6}** In answer to the State's question whether he saw anything in Child's behavior that he thought was suspicious, the officer testified that "it was a little strange that as . . . they were on the south side of the Laundromat approaching the Laundromat from the east, . . . as I pulled up . . . coming from the west toward[] the east, they saw me [and] they began immediately walking to the back of the Laundromat. . . . Nothing real suspicious at that time but it is one of those things that makes you say well maybe I should talk to these people. . . . Nothing incriminating, but possibly suspicious." The officer nevertheless thought Child "appeared to be acting nervous initially just by running" into the Laundromat and that Child appeared "a little more nervous" as the officer began talking to him, which added to the officer's suspicions. Because Child and his companion had their hands in the pockets of their jackets, for safety the officer asked them both to show their hands. The companion complied, but Child did not, and the officer started to wonder why Child was not pulling his hands out of his pockets. Officer Gaines again asked Child to pull his hands out but Child pulled out only his left hand, which seemed strange to the officer. The officer took a step closer to Child, and Child immediately took his right hand out. The officer noticed that the right side of Child's jacket was hanging lower than the other side, indicating something heavy in the front jacket pocket.

**{7}** For his safety, the officer approached Child and patted the pocket for a weapon and he immediately recognized what he knew was a revolver in the jacket pocket. He asked Child what was in the pocket; Child began stuttering and could not answer. The officer pulled out the revolver and continued a patdown for any additional weapons. During the continued patdown, a large glass pipe which the officer recognized as a marijuana pipe fell out of Child's pocket. The officer asked Child where the drugs were, and Child said they were in his front pants pocket. The officer asked if he could retrieve them and he pulled marijuana from Child's pants pocket.

**{8}** The State filed a petition alleging that Child was a delinquent child and charging Child with unlawful possession of a handgun by a person less than nineteen years, possession of marijuana one ounce or less, and use or possession of drug paraphernalia. Child moved to suppress the evidence obtained from the search. Child asserted that the officer had no legal basis on which to stop him and that the patdown search was a direct result of an illegal seizure.

**{9}** In its response, the State argued that the officer did not need reasonable suspicion to stop Child and to frisk him. The State also argued that the officer had reasonable and individualized suspicion based on the facts that "[t]he juveniles were in the area where a crime had been reported and they ran from Officer Gaines when Officer Gaines tried to approach them." Somewhat differently, in the hearing on the motion to suppress, the State argued that the officer had reasonable suspicion to stop Child based on the information the officer had been given by dispatch, and he had reasonable suspicion to conduct a patdown for weapons based on Child's nervous, evasive, and suspicious behavior.

**{10}** Child testified at the suppression hearing. He stated that he was playing X-Box at his brother-in-law's house. He was waiting for his mother to pick him up. His mother did not arrive, and Child and his cousin walked to the Laundromat to call Child's mother from

3

a pay phone to come pick him up. The phone was in the back of the Laundromat, and Child typically entered the Laundromat at that location. He did not see the police until he walked out of the Laundromat. Upon exiting the building, Child saw three police cars in front of the building. Child said he was not asked any investigative questions before Officer Gaines patted him down and discovered the revolver, marijuana, and marijuana pipe. In rebuttal testimony, Officer Gaines testified that he was the only officer at the Laundromat until after he retrieved the gun from Child's pocket.

{11} Following the testimony and counsel's argument at the hearing on Child's motion to suppress, the court indicated that the officer's initial contact with Child was appropriate and justified based first on the report of a gun in the area and based also on having observed Child and the other person as the only people walking in the area followed by Child's evasive behavior upon seeing the officer. The court stated that the patdown was reasonable considering Child's continued evasive behavior in refusing to show his hands combined with the officer's observation of Child's jacket hanging low after Child did finally remove both hands.

{12} Following the hearing, Child agreed to admit to the charge of use or possession of drug paraphernalia, reserving his right to appeal the court's decision on his motion to suppress. Not long afterward, Child filed a motion to reconsider. In his motion, Child discussed circumstances relating to the 911 call, particularly stressing the fact that the call was from an anonymous caller who identified a female as the person who pulled the gun on him and arguing that the information in the call was insufficient for the police to suspect Child was involved in the incident. Child also argued that "Officer Gaines' investigatory seizure of the Child, after merely observing . . . Child quickly enter the rear entrance of the Laundromat was not enough to establish reasonable suspicion that . . . Child was or had been engaging in any criminal activity."

{13} The court did not enter written findings of fact or a written order denying Child's motion to suppress or motion for reconsideration. Within several days, the court entered a judgment and disposition in which the court stated that Child had been adjudicated on the day of the suppression hearing of use or possession of drug paraphernalia. The court placed Child on probation for an indeterminate period of time not to exceed two years. Child's specific assertion of error on appeal is that the officer did not have reasonable, articulable suspicion of criminal activity to justify his seizure, and therefore, the evidence ultimately obtained pursuant to the unlawful seizure had to be suppressed.

**STANDARD OF REVIEW**

{14} When we review a court's denial of a motion to suppress, "[w]e view the facts in the manner most favorable to the prevailing party and defer to the district court's findings of fact if substantial evidence exists to support those findings." *State v. Urioste*, 2002-NMSC-023, ¶ 6, 132 N.M. 592, 52 P.3d 964. "All reasonable inferences in support of the district court's decision will be indulged in, and all inferences or evidence to the contrary will be disregarded." *State v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856 (alterations omitted) (internal quotation marks and citation omitted). When a seizure

4

occurred and whether it was based on reasonable suspicion are mixed questions of fact and law because they involve the mixture of facts and evaluative judgments. *See State v. Attaway*, 117 N.M. 141, 145-46, 870 P.2d 103, 107-08 (1994) (concluding that the mixed question of exigent circumstances should be subject to de novo review as a question of law). We review those questions de novo. *Id.*; *Urioste*, 2002-NMSC-023, ¶ 6 (indicating that search and seizure issues and determinations of reasonable suspicion are mixed questions of fact and law that should be reviewed de novo).

## DISCUSSION

**{15}** There is no issue in this case regarding whether Child was seized under the Fourth Amendment to the United States Constitution or under article II, section 10 of the New Mexico Constitution. The first task at hand is to attempt to determine at what point Child was seized and then to attempt to determine whether the seizure was supported by reasonable suspicion and was lawful. "Reasonable suspicion must exist at the inception of the seizure." *State v. Garcia*, 2009-NMSC-046, ¶ 43, 147 N.M. 134, 217 P.3d 1032 (internal quotation marks and citation omitted).

**{16}** In his briefs, Child attempts to transfer or expand the reasonable-suspicion requirement from the individual officer to "the police" and to the dispatcher in arguing that "[t]he police would only possess the reasonable suspicion to investigate one female, not two males," emphasizing that the dispatch operator did not tell the officer that a female had pulled a gun, and that "the focus should be on whether the dispatch operator had reasonable suspicion to tell the officers that 'someone' had pulled . . . a gun on Johnny Smith." We reject Child's argument that the dispatcher or that the police, generally based on what the dispatcher was told, had to have articulable, reasonable suspicion to sustain Officer Gaines' seizure of Child. Child provides no authority for such an argument, we will not attempt to research the point for Child, and we will not consider it. *In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) (stating that an appellate court will not consider an issue if no authority is cited in support of that issue). Furthermore, at oral argument in this case, defense counsel, who replaced counsel who wrote Child's appellate briefs, abandoned the foregoing expansive view of the reasonable-suspicion requirement.

**{17}** Child appears to assert that Officer Gaines had a too-limited amount of information from dispatch to approach Child just based on Child's proximity to the school. Child points out that the officer was told only that "someone" had pulled a gun on the caller in the area of the school while the caller was trying to buy drugs. Thus, Child appears to argue that the 911 call was somehow legally insufficient to permit the officer to initiate contact with Child to ask questions.

**{18}** We reject this argument as well. Under the circumstances, we see no basis on which to hold that Officer Gaines had no lawful basis on which to even initiate a generalized investigation of the reported criminal activity by attempting to talk to Child. A more accurate or detailed statement from the dispatch operator regarding the gender of the person with the gun might have caused Officer Gaines to ignore Child and his companion. Notwithstanding this poor communication, however, based on the information he received

5

from dispatch, Officer Gaines lawfully could approach individuals walking in the Tibbetts school area, including Child and his companion, to ascertain if they would answer questions in regard to the reported criminal activity without first having articulable, reasonable suspicion that the individuals had been engaged in the reported criminal activity. *See Jason L.*, 2000-NMSC-018, ¶ 14 ("The police do not need any justification to approach a person and ask that individual questions; however, the officer may not convey a message that compliance with their requests is required." (internal quotation marks and citation omitted)); *see also State v. Gutierrez*, 2007-NMSC-033, ¶ 32, 142 N.M. 1, 162 P.3d 156 ("Courts have consistently recognized that law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen." (internal quotation marks and citation omitted)). An investigatory stop and seizure does not occur from such an approach as long as (1) the officer does not convey a message that compliance with his request is required, or (2) the circumstances do not cause a reasonable individual to believe that he was not free to refuse compliance and to disengage or leave. *Jason L.*, 2000-NMSC-018, ¶¶ 14-15.

**{19}** We turn to the question of when Child was seized. In oral argument, Child argued that he was seized when the officer called for him to come out of the Laundromat, but if not at that point, then when the officer asked or told Child to take his hands out of his pockets. The district court appears to have determined that Child was seized when the officer asked Child to show his hands, and to have reasoned and concluded that, on balance, based on what the officer was told by dispatch, what he saw, and the expressed concern for his own and community safety, the officer lawfully required the show of hands. The court felt the officer's actions were appropriate and justified because a weapon was allegedly involved in the reported criminal activity occurring only minutes before the officer encountered Child in the same general area as the location of the reported activity, because Child and his companion were the only people the officer saw walking in the area, and because Child evasively moved toward the Laundromat when he saw the police.

**{20}** In deciding this question, we see no need to decide whether a seizure occurred at the point the officer asked or told Child to come out of the Laundromat. We determine, under the facts and arguments presented in this appeal and based on how we read our case law, that the officer's request or command that Child take his hands out of his pockets constituted a seizure. At that point and by that request, the officer made a show of authority such that any reasonable person in Child's circumstance would not have felt free to refuse compliance and to leave. *See Garcia*, 2009-NMSC-046, ¶¶ 35-37 (maintaining "*Mendenhall*'s free-to-leave test as the proper measure of a seizure under [a]rticle II, [s]ection 10 [of the New Mexico Constitution]"); *Jason L.*, 2000-NMSC-018, ¶¶ 16-17 (reciting one factor for determining freedom to leave to be the conduct of the officer including use of language or tone of voice indicating that compliance with the officer's request might be compelled, concluding that a seizure occurred and a person in the defendant's position would not feel free to leave when the officer twice asked the defendant if he had any knives or guns, and relying in part on a federal case holding that a police officer's show of authority, announcing he was a police officer, and ordering the defendant to stop was an investigative seizure); *State v. Talley*, 2008-NMCA-148, ¶ 14, 145 N.M. 127, 194 P.3d 742 (stating that the officer's ordering the

defendant to remove his hand from his pocket constituted a show of authority and that a show of authority is a restraint when the subject submits to that authority).

**{21}** This show-of-hands point required articulable, reasonable suspicion that Child had engaged in criminal activity in order for the officer to initiate, as he did, an investigatory detention of Child. *See State v. Funderburg*, 2008-NMSC-026, ¶ 15, 144 N.M. 37, 183 P.3d 922 (stating that reasonable suspicion is a "commonsense, nontechnical conception[], which requires that officers articulate a reason, beyond a mere hunch, for their belief that an individual has committed a criminal act" (alteration in original) (internal quotation marks and citation omitted)); *Gutierrez*, 2007-NMSC-033, ¶ 29 ("The Fourth Amendment . . . requires that an officer have reasonable, articulable suspicion of criminal activity to justify a temporary seizure for the purpose of questioning[.]"); *Urioste*, 2002-NMSC-023, ¶ 10 ("A police officer cannot forcibly stop an individual for purposes of investigation merely on the basis of an inchoate and unparticularized suspicion or hunch that criminal activity may be afoot." (internal quotation marks and citation omitted)); *Jason L.*, 2000-NMSC-018, ¶ 20 (stating that "[a] reasonable suspicion is a particularized suspicion . . . that a particular individual, the one detained, is breaking, or has broken, the law" and that "[r]easonable suspicion must exist at the inception of the seizure").

**{22}** We specifically limit our holding as to seizure to the facts and to the arguments in this case. Child at no time argued in the district court or in this Court the question whether under these or analogous circumstances, including when an encounter has not yet turned into a seizure or investigative detention, an officer should be permitted, for safety reasons, without having individualized and articulable, reasonable suspicion of criminal activity, to merely ask a person to take his hands out of his pockets before continuing with an intended voluntary or consensual encounter. *See State v. Nettles*, 855 P.2d 699, 702 (Wash. Ct. App. 1993) (stating that in furtherance of the community-caretaker function "it is not unreasonable to permit a police officer in the course of an otherwise permissive encounter to ask an individual to make his hands visible"); *see also People v. Hardrick*, 60 P.3d 264, 269 (Colo. 2002) (holding that in a circumstance in which a third party inserts himself into a situation where an officer is engaged in a valid search or arrest the officer "may ask the interloper to show his hands" in order to ensure officer safety); *State v. Jennings*, 99 P.3d 1145, 1149-50 (Kan. Ct. App. 2004) (indicating that the officer's statement to subjects to remove their hands from their pockets during a voluntary encounter "was simply made for officer safety reasons and would not communicate to a reasonable person that he or she was not free to leave" and therefore did not turn the voluntary encounter into a seizure). We intimate no view one way or another on this question, leaving it perhaps for another day.

**{23}** The difficult and close question for us to answer is whether the circumstances leading up to the request for a show of hands gave rise to articulable, reasonable suspicion that Child was involved in criminal activity. The State contends that the following circumstances are sufficient to create articulable, reasonable suspicion. Officer Gaines was investigating the use of a gun in a drug transaction in a particular area. This criminal activity was within two blocks of the Laundromat. The officer saw Child and his companion walking from the direction of the school. The two were the only people the officer saw walking in the Laundromat area. The officer saw that they had their hands in their pockets. When he

7

hollered, the officer saw that Child saw him, and he saw Child immediately dart into the Laundromat. At the same time, Child's companion complied with the officer's request to talk to them. The State's underlying thrust is that of proximity of the encounter with Child to the area of the reported activity. *See State v. Cobbs*, 103 N.M. 623, 625-27, 711 P.2d 900, 902-04 (Ct. App. 1985) (determining that officers dispatched to investigate suspicious persons in the area of a suspected residential burglary in progress, where two men were reportedly repeatedly approaching the residence and returning to a vehicle parked behind the residence, had reasonable suspicion to stop a vehicle as it was leaving and to proceed to conduct a patdown of the two occupants); *see also State v. Jimmy R.*, 1997-NMCA-107, ¶¶ 2-3, 124 N.M. 45, 946 P.2d 648 (determining that the officer had reasonable suspicion to seize subjects who were in the vicinity of reported criminal activity when the officer observed no other persons in the area and the subjects began to walk away when the officer drove up); *State v. Watley*, 109 N.M. 619, 624, 788 P.2d 375, 380 (Ct. App. 1989) (upholding an investigative stop and detention of a suspect where, under the totality of the circumstances, including the fact that the subject was in the immediate area of the recently reported criminal activity, the officer "could reasonably have concluded that [the] defendant may have been involved in the commission of the reported offense").

**{24}** We must disagree. The proximity basis on which the State relies is not sufficient in this case to support the necessary individualized articulable, reasonable suspicion at the point the officer told Child to take his hands out of his pockets following which Child complied to the extent of first taking one hand out, and later taking both hands out. The evidence produced from the ensuing patdown was therefore unlawfully obtained and should have been suppressed.

## CONCLUSION

**{25}** We reverse the district court's denial of Child's motion to suppress. The motion should have been granted and the evidence in question should have been suppressed. We remand for further proceedings in accordance with this opinion.

**{26}** **IT IS SO ORDERED.**

                                                           _____

                                                           **JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____

**CYNTHIA A. FRY, Chief Judge**

_____

**MICHAEL D. BUSTAMANTE, Judge**

**Topic Index for *State v. Eric. K.*, No. 28,583**

**AE**                    **APPEAL AND ERROR**
AE-SR             Standard of Review

**CD**                    **CHILDREN**
CD-DT             Detention

**CL**                    **CRIMINAL LAW**
CL-CL            Controlled Substances
CL-WO           Weapons Offences

**CT**                    **CONSTITUTIONAL LAW**
CT-FA            Fourth Amendment
CT-SU           Suppression of Evidence

**CA**                    **CRIMINAL PROCEDURE**
CA-RS            Reasonable Suspicion
CA-SZ            Search and Seizure
CA-WS           Warrantless Search