Certiorari Denied, May 8, 2012, No. 33,519

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2012-NMCA-061

Filing Date: February 17, 2012

Docket No. 30,026

MARY JANE HICKS,

     Plaintiff-Appellant,

v.

PETER ELLER,

     Defendant-Appellee.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Beatrice Brickhouse, District Judge

Law Office of John M. Wells, P.A.
John M. Wells
Albuquerque, NM

for Appellant

Law Offices of Martin E. Threet & Associates
Martin E. Threet
Albuquerque, NM

for Appellee

OPINION

CASTILLO, Chief Judge.

{1}     As personal representative of her mother's estate, Mary Jane Hicks contacted Peter Eller, an art appraiser, to help evaluate her mother's property. Hicks had heard one of Eller's advertisements on the radio. Ultimately, Eller did not provide appraisal services, but he did purchase two paintings by Dunton (the Duntons) from Hicks for $4,500. Eller then sold the Duntons for $35,000 to another art dealer who sold them to an art collector from

1

Texas for $300,000.  The art collector sold the Duntons at auction for approximately $600,000.  When Hicks learned about this, she filed suit against Eller asserting various causes of action including negligent misrepresentation and violation of the Unfair Practices Act (UPA).  The matter went to trial and, after a reduction to the judgment for comparative negligence, Hicks was awarded $14,600.  She filed a motion for additur that was denied.  Hicks appeals.

**{2}** We have three questions to consider.  Does the UPA allow a seller of goods to bring a cause of action against the purchaser in these circumstances?  Is comparative negligence a valid defense to negligent misrepresentation and, if so, should it have been a part of the pretrial order before the jury could be instructed on the issue?  And, lastly, did the district court err when it denied Hicks' motion for additur?  We affirm.

## I.    BACKGROUND

**{3}** We begin with a summary of the evidence presented at trial.  Hicks was appointed representative of her deceased mother's estate that included numerous pieces of art and other items.  Eller is an art appraiser and dealer based in Albuquerque, New Mexico.  Hicks had heard Eller's services advertised on the radio and contacted Eller in March 2007 to secure assistance in assessing whether any of the art in the estate was valuable.

**{4}** Hicks and Eller initially spoke by phone and later met at Eller's gallery where they set up a time for Eller to visit Hicks' mother's home.  When Eller visited the house, they had a discussion before he examined any of the art.

**{5}** Eller explained the purpose of an appraisal and the fees associated with that process.  He informed Hicks that his charge was $250 for the first item appraised and $120 to $150 for each additional item appraised.  Eller testified that after explaining his fees, it became apparent to him that Hicks did not intend to hire him to perform a formal appraisal.  Rather, it appeared to Eller that what Hicks wanted was to dispose of some of the items in her mother's estate.  As such, Eller suggested that he be allowed to look at the art in the house and be allowed to make an offer to purchase any items that were of interest to him.  Hicks agreed to this arrangement.

**{6}** Hicks led Eller on a walk-through of the home and showed Eller a number of different items.  Eventually, Hicks showed Eller two paintings that she had found in a storage area under the home.  The paintings appeared to be from the same artist, and one was signed "Dunton."  Eller recognized the name immediately and informed Hicks that William Herbert Dunton was a member of the Taos society of artists who painted in the 1920s and 1930s.  The paintings were slightly discolored and had other flaws as a consequence of improper storage.  Nevertheless, Eller informed Hicks that he was interested in purchasing the two paintings.

**{7}** According to Eller, Hicks was unwilling to sell the paintings at that time.  Instead,

2

Hicks showed him a number of other items and, before Eller departed, Hicks agreed to allow him to return at some future date. Eller testified that he returned to the house several days later and bought the Duntons at that time. Hicks, however, testified that Eller acquired the paintings the very day he first saw them. Despite this conflict in the evidence, the parties do not dispute the facts surrounding the sale itself.

{8}     Eller offered $4,500 for both paintings. Hicks responded by inquiring whether that offer was fair. Eller purposely chose not to answer that question and instead asked whether they had a deal. Hicks responded affirmatively and Eller wrote her a check.

{9}     As we explained before, not long after the sale to Eller, the Duntons were sold to another art dealer, then to an art collector, and ultimately sold at auction for $600,000. After learning of this, Hicks filed suit against Eller and asserted fraud, dispossession and conversion, negligent misrepresentation, violation of the UPA , and professional negligence. In her complaint, Hicks alleged that the Duntons were worth at least $500,000 and requested $495,500 in actual damages, $500,000 in punitive damages, $1,486,500 in triple damages, and attorney's fees and costs. The matter went to trial.

{10}    At the close of trial, the jury was instructed only as to the claims of fraudulent misrepresentation and negligent misrepresentation. The court specifically declined to allow the jury to consider the UPA claim because, in the court's view, Hicks failed to demonstrate that she had acquired any services from Eller—a necessary element of a UPA claim in the court's assessment. Eller proposed a comparative negligence instruction, and the court issued that instruction over Hicks' objection.

{11}    The jury determined that Eller did not fraudulently misrepresent information about the Duntons but did negligently misrepresent information about the paintings and determined that the negligent misrepresentation caused Hicks' damages. The jury awarded Hicks $20,000 and determined that Eller was 73% at fault and that Hicks was 27% at fault. In the wake of the verdict, Hicks submitted a motion for additur or new trial and argued that the jury's award was not in accord with the evidence concerning the value of the paintings. Hicks directed the court to the fact that Eller received $35,000 for the paintings and that Hicks' expert testified that the fair market value of the paintings was at least $405,000. Hicks asked the court to grant her an additur of $380,500 or, alternatively, a new trial.

{12}    The district court entered judgment awarding Hicks the damages determined by the jury, reducing the award to $14,600 in light of the jury's comparative negligence determination. Thereafter, the court denied Hicks' motion for additur or a new trial. We now consider Hicks' contentions on appeal.

## II.     DISCUSSION

{13}    Hicks raises three issues. First, she claims that the district court erred in refusing to submit her UPA claim to the jury. Second, she claims that the court committed reversible

error by allowing the jury to consider comparative negligence. Third, she contends that the district court abused its discretion in denying her motion for additur or new trial. We address these issues in turn.

**A.      UPA Claim**

**{14}**    At the close of trial, the district court determined that the UPA claim could not go to the jury because Hicks failed to allege sufficient facts to state a UPA claim. The court first explained that "there has to be some type of contractual relationship [and] there [has] to be some kind of privity relationship" and concluded that Hicks failed to establish that "there was any sale or lease of any goods or services" and that Hicks "did not purchase the services of being an appraiser by . . . Eller." The court then stated that "Eller is the merchant[,] and he's purchasing from . . . Hicks[,] and so I don't see that the UPA comes into play in this scenario."

**{15}**    On appeal, Hicks argues that the court's decision amounted to a directed verdict or judgment as a matter of law under Rule 1-050 NMRA. We agree with Hicks' characterization of the district court's ruling below. As a matter of procedure, the issue is whether the court acted properly in granting a directed verdict in favor of Eller.

**{16}**    "A directed verdict may be granted if there is no legally sufficient evidentiary basis for a reasonable jury to find in favor of a party or may be granted as a matter of law against a party with respect to a claim that cannot, under controlling law, be maintained without a favorable ruling on the issue." *Hedicke v. Gunville*, 2003-NMCA-032, ¶ 9, 133 N.M. 335, 62 P.3d 1217. "Directed verdicts are not favored and should only be granted when the jury cannot reasonably and logically reach any other conclusion." *W. States Mech. Contractors, Inc. v. Sandia Corp.*, 110 N.M. 676, 679, 798 P.2d 1062, 1065 (Ct. App. 1990). "In ruling upon and reviewing a motion for a directed verdict, the court must consider all of the evidence. If there are conflicts or contradictions, they must be resolved in favor of the party resisting the motion." *Id.* at 679-80, 798 P.2d 1065-66. "The sufficiency of evidence presented to support a legal claim or defense is a question of law for the trial court to decide. This Court reviews questions of law de novo." *Hedicke*, 2003-NMCA-032, ¶ 9 (internal quotation marks and citations omitted).

**{17}**    The UPA provides that "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful." NMSA 1978, § 57-12-3 (1971). An "unfair or deceptive trade practice" is defined as follows:

> an act specifically declared unlawful pursuant to the [UPA], a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person. . . .

4

NMSA 1978, § 57-12-2(D) (2009). There are eighteen statutorily enumerated unfair or deceptive trade practices within the UPA. *See* § 57-12-2(D)(1) to (18).

**{18}** This Court has evaluated this somewhat complicated statutory scheme and clarified that there are three essential elements to a UPA claim. *Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 5, 142 N.M. 437, 166 P.3d 1091. This includes:

> (1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person.

*Id.* Here, the district court focused on element two and determined that Hicks failed to proffer evidence that Eller made a misrepresentation in connection with the sale of his services as an art appraiser. It appears that the court concluded that Hicks' decision to decline to request a formal appraisal brought the matter outside the ambit of the UPA. Thus, the narrow legal issue before us is whether the court correctly determined that there was insufficient evidence to establish the second element of a UPA claim.

**{19}** Hicks argues that this ruling is "contrary to the principles, policies, and holdings" in *Lohman*. In *Lohman*, a class action lawsuit against the manufacturer of allegedly defective seatbelts, our Court discussed the second element of a UPA claim in detail. 2007-NMCA-100, ¶¶ 2-3, 27-33. The *Lohman* plaintiffs did not allege that they had engaged in a "transaction" with the defendants; consequently, the defendants argued that "the 'connection with the sale of goods' requirement can only be satisfied upon a showing that the defendant made a misrepresentation when selling a product to the plaintiff." *Id.* ¶ 28. The Court rejected the defendants' argument and observed that the UPA is remedial legislation which is to be liberally construed and applied. 2007-NMCA-100, ¶ 31. Examining the plain language of the UPA, the Court determined that "[t]he conjunctive phrase 'in connection with' seems designed to encompass a broad array of commercial relationships." 2007-NMCA-100, ¶ 21. The Court found nothing in the phrase that would suggest a transaction between a claimant and a defendant is a necessary element to a UPA claim. 2007-NMCA-100, ¶ 32. The Court further clarified that the language of the statute "does not require the plaintiff to acquire goods or services *from* the defendant." *Id.* Rather, the UPA merely contemplates "a plaintiff who seeks or acquires goods or services *and* a defendant who provides goods or services." 2007-NMCA-100, ¶ 32.

**{20}** While we agree that *Lohman* does not require a transaction between a claimant and a defendant, *Lohman* does stand for the proposition that the plaintiff must have sought or acquired goods or services and the defendant must have provided goods or services. *Id.* We understand this to mean that the plaintiff does not necessarily have to purchase the product from the defendant, but that somewhere along the purchasing chain, the claimant did

purchase an item that was at some point sold by the defendant. Although Hicks contacted Eller to acquire his services as an art appraiser, those services were never purchased, and the transaction that is the subject of the suit relates to Hicks' sale of the Duntons and Eller's purchase of the paintings. Consistent with its purpose as consumer protection legislation, the UPA gives standing only to buyers of goods and services. See *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 2005-NMCA-051, ¶ 17, 137 N.M. 524, 113 P.3d 347 ("However, the [L]egislature has not chosen to treat sellers and buyers identically under the UPA."). Because Hicks never purchased anything from Eller or an intermediary of Eller, she has no UPA claim against him.

**{21}** Hicks contends that although she sold the Duntons to Eller, it is inaccurate to characterize the parties' positions based merely on the end result of their relationship. According to Hicks, Eller was given access to the art in Hicks' mother's estate only because Hicks sought Eller's professional services as an art appraiser. Hicks goes on to argue that Eller "subtly switched his role from appraiser to buyer and presented himself with the opportunity to buy some valuable paintings at a grossly unfair price." Hicks' position is that Eller applied a "variation of the ancient 'bait and switch' in which he switched roles instead of products." Hicks provides no support for this argument. Generally "bait and switch" is the tactic of advertising one product and then convincing customers seeking the product to buy a more expensive one instead. *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1230 (10th Cir. 2007); *Fendrich v. RBF, L.L.C.*, 842 So. 2d 1076, 1079 n.1 (Fla. Dist. Ct. App. 2003). The tactic is a selling tactic. Hicks directs us to no cases in which a court determined that a "bait and switch" had occurred when the role of seller was switched to that of buyer; therefore, we assume that there is none. *In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) ("We assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority. We therefore will not do this research for counsel."). Accordingly, we decline to review this argument. See *State v. Eric K.*, 2010-NMCA-040, ¶ 16, 148 N.M. 469, 237 P.3d 771. For the reasons stated above, we conclude that the district court did not err in granting a directed verdict in Eller's favor on the UPA claim. We turn to the next issue.

## B.  Comparative Negligence

**{22}** Hicks contends that the court erred in allowing the jury to consider comparative negligence. We begin by reviewing the specific facts underlying this argument.

**{23}** At the close of trial, Eller requested that the jury be instructed on comparative negligence and submitted a proposed instruction to this effect. That instruction provides the following:

> If you find [Hicks'] injury was caused by a combination of negligence of [Eller] and negligence of [Hicks], you must determine the amount of damages to be awarded as follows:

6

First: In accordance with the damage instruction I have given you, determine the total amount of damages suffered by [Hicks].

Second: Compare the negligence of [Hicks] and [Eller] and determine a percentage for each so that the total of the percentage equals 100%.

{24} Hicks objected to this instruction at an off-record conference, and the district court later specifically noted the objection for the record. Despite the objection, the court agreed to submit the instruction to the jury and explained that "anytime you have negligence[,] then the jury is allowed to enter into a comparative negligence[] comparison." The jury found Eller 73% at fault and Hicks 27% at fault, and the court later adjusted Hicks' damages accordingly.

{25} On appeal, Hicks makes two arguments in support of her contention that the court erred in allowing the jury to consider comparative negligence and apportion fault. First, she asserts that Eller failed to raise the issue of comparative negligence before trial and, therefore, he was precluded from raising the issue at the end of trial when the issue of jury instructions came up. Second, she claims that comparative negligence is not, as a matter of law, a valid defense to negligent misrepresentation and, therefore, the instruction was improper. Eller has not responded to either of these arguments, but instead contends that Hicks failed to preserve her objection to the comparative negligence instruction because the objection was made off record. We start with our standard of review.

{26} "The propriety of a jury instruction is a mixed question of fact and law[.]" *Castillo v. City of Las Vegas*, 2008-NMCA-141, ¶ 17, 145 N.M. 205, 195 P.3d 870. Under this standard, we review questions of fact for substantial evidence and conduct a de novo review of the application of those facts to conclusions of law. *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000-NMSC-033, ¶ 7, 129 N.M. 698, 12 P.3d 960.

{27} We are not persuaded by Eller's lack of preservation argument. It is clear that Hicks invoked a ruling from the district court on the issue of the propriety of the comparative negligence instruction. *See* Rule 12-216(A) NMRA ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked[.]"). The district court specifically noted Hicks' objection for the record and explained why the instruction would be issued. *See State v. Lopez*, 2008-NMCA-002, ¶ 8, 143 N.M. 274, 175 P.3d 942 ("The objection must be timely and must specifically apprise the district court of the claimed error, resulting in an intelligent ruling from the district court."). We see no issue regarding preservation.

{28} We are similarly unpersuaded by Hicks' argument that Eller was precluded from requesting a comparative negligence instruction because the issue of comparative negligence was not raised prior to trial. While it is true that comparative negligence is not referenced in the pretrial order and, "[o]rdinarily, only those theories of liability contained in the pretrial

7

order will be considered at trial[,]" *Fahrbach v. Diamond Shamrock, Inc.*, 122 N.M. 543, 550, 928 P.2d 269, 276 (1996), a trial court may modify a pretrial order and has broad discretion to do so. *Herrera v. Springer Corp.*, 89 N.M. 45, 48, 546 P.2d 1202, 1205 (Ct. App. 1976). "[T]he test for modification is the prevention of manifest injustice which determination is within the discretion of the trial court." *State ex rel. State Highway Dep't v. Branchau*, 90 N.M. 496, 497, 565 P.2d 1013, 1014 (1977). We have previously determined that an amendment to a pretrial order that prevents perpetuation of error and brings the action into conformity with applicable law is not an abuse of discretion. *Mantz v. Follingstad*, 84 N.M. 473, 475, 505 P.2d 68, 70 (Ct. App. 1972).

{29}    Here, the trial court determined that the jury was entitled to consider comparative negligence because one of Hicks' theories of liability was negligence, i.e., negligent misrepresentation. "In New Mexico, comparative[]fault principles apply unless such application would be inconsistent with public policy." *Reichert v. Atler*, 117 N.M. 623, 625, 875 P.2d 379, 381 (1994). Hicks makes no argument that public policy would preclude the application of comparative fault in this case.

{30}    Hicks' primary argument is that comparative negligence is not a defense to negligent misrepresentation. The appellate courts of New Mexico have not had occasion to consider whether comparative negligence is a defense to negligent misrepresentation. As Hicks points out, this Court and our Supreme Court have considered closely related matters. In *Otero v. Jordan Rest. Enter.*, 122 N.M. 187, 192-93, 922 P.2d 569, 574-75 (1996), our Supreme Court determined that comparative negligence is not a defense to fraud. The Court relied on public policy and explained that "[o]ne guilty of fraud cannot be allowed by operation of law to profit by that fraud." *Id.* at 192, 922 P.2d at 574. *Otero* is distinguishable from the present matter. Fraud, unlike negligent misrepresentation, involves the making of a false statement that was known to be false or was recklessly made. *See* UJI 13-1633 NMRA. In *Neff v. Bud Lewis Co.*, 89 N.M. 145, 148-49, 548 P.2d 107, 110-11 (Ct. App. 1976), this Court considered whether the defendant, a fiduciary, could assert contributory negligence as a complete shield to a claim for negligent misrepresentation. We determined that the defendant could not avail itself of the defense and explained that the plaintiff "had a right to rely on the defendants' representations." *Id.* at 149, 548 P.2d a 111. *Neff*, too, is distinguishable; the defendant in that matter was a fiduciary, and comparative negligence was not at issue there. The matter before us is one of first impression.

{31}    Other jurisdictions have considered the issue. As the Rhode Island Supreme Court described in *Estate of Braswell ex rel. Braswell v. People's Credit Union*, 602 A.2d 510, 512-15 (R.I. 1992), there are two views on the matter, a majority and a minority. The majority holds that "the imposition of principles of comparative negligence is an appropriate method for apportioning liability when the misrepresentation is only negligent." *Estate of Braswell*, 602 A.2d at 513. At least thirteen states have adopted this view. *See Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 337 n.1 (Fla. 1997). Moreover, this view is in line with the *Restatement (Second) of Torts* § 552A (1977), which provides that "[t]he recipient of a negligent misrepresentation is barred from recovery for pecuniary loss suffered

8

in reliance upon it if he is negligent in so relying." Commentators writing in support of the majority view have observed that "there is no apparent reason for distinguishing negligent misrepresentation from any other negligence in [the application of contributory or comparative negligence concepts]." *Florenzano v. Olson*, 387 N.W.2d 168, 176 (Minn. 1986) (alteration in original) (internal quotation marks and citation omitted).

**{32}**    Defendant asks that we adopt the minority view which holds that "principles of comparative negligence are not to be applied to actions founded on negligent misrepresentation resulting in pecuniary loss." *Estate of Braswell*, 602 A.2d at 514. At least five states have adopted this view, *see Gilchrist Timber Co.*, 696 So. 2d at 338 n.1, including the California Court of Appeal for the third district, *see Carroll v. Gava*, 159 Cal. Rptr. 778, 781 (Ct. App. 1979). In analyzing this issue, the California Court of Appeal observed that the law of misrepresentation evolved from the action of the case of deceit in business transactions. *Id.* The court concluded that comparative fault analysis has no place in business transactions or in the "multitude of everyday exchanges[.]" *Id.* The court explained that predictability demands that the risk of falsity fall on the one who makes a representation. *Id.* The Rhode Island Supreme Court was persuaded by this reasoning and adopted the minority view for the same reasons. *Estate of Braswell*, 602 A.2d at 515.

**{33}**    In our view, the majority view is more persuasive because we see no basis for treating negligent misrepresentation differently from any other negligence action. In New Mexico, the general rule is that absent inconsistency with public policy, comparative fault principles will apply to negligence actions. *Reichert*, 117 N.M. at 625, 875 P.2d at 381. We do not agree that permitting apportionment of fault between one who commits negligent misrepresentation and one who negligently relies on that misrepresentation will cast the multitude of everyday exchanges into disarray. "[T]he basis for comparative fault is that each individual tortfeasor should be held responsible only for his or her percentage of the harm." *Id.* Hicks has not shown why this simple principle should not apply in the context of negligent misrepresentation. Moreover, the principles articulated in the *Restatement (Second) of Torts* have been widely accepted in this jurisdiction and we see no reason to carve out an exception for Section 552A. For these reasons, we adopt that section of the *Restatement* and conclude that comparative negligence is a defense to negligent misrepresentation.

**{34}**    We conclude that the district court did not err in issuing Eller's comparative negligence instruction. We proceed to the final issue on appeal.

**C.    Additur**

**{35}**    In her last argument, Hicks challenges the district court's denial of the motion for additur. An "additur" is an "order, issued usu[ally] with the defendant's consent, that increases the jury's award of damages to avoid a new trial on grounds of inadequate damages." *Black's Law Dictionary* 44 (9th ed. 2009). Our Supreme Court established the applicable rule on additur in *Hammond v. Blackwell*, 77 N.M. 209, 212, 421 P.2d 124, 126

(1966). There, the Court stated that an award of damages will not be disturbed on appeal "except where it appears to have resulted from passion, prejudice, partiality, sympathy, undue influence, or some corrupt cause or motive, where there has been palpable error, or the measure of damages has been mistaken." *Id.* (internal quotation marks and citation omitted).

**{36}**    Here, Hicks argues that the damages are insufficient and that the award of $20,000 finds no basis in the evidence. We cannot agree with these claims. Hicks testified that she understood that art dealers, like Eller, generally offer one-half the amount they expect to get for an item upon resale. Eller testified that his "general thought" as to the value of the Duntons was about $35,000, and he stated that he would have been willing to pay Hicks as much as $16,000 for them. After purchasing the Duntons from Hicks, Eller sold the paintings for precisely the amount he believed they were worth—$35,000.

**{37}**    The jury awarded Hicks $20,000 in damages. This award exceeded what Hicks would have received from Eller had Eller been absolutely forthright with Hicks about his "general thoughts" as to the value of the paintings. Thus, we cannot say the measure of damages was mistaken or unsupported by the evidence.

**{38}**    Hicks correctly notes that her expert testified that the paintings could have sold for as much as $405,000. Indeed, the evidence showed that the art collector received almost $600,000 at auction. However, this evidence does not negate the fact that Defendant received $35,000 for the paintings, exactly what he expected he would receive. To the extent that Plaintiff's expert's assessment of the value of the paintings conflicted with Eller's assessment, it was for the jury to reconcile that conflict in the evidence. *See Gonzales v. Gen. Motors Corp.*, 89 N.M. 474, 477, 553 P.2d 1281, 1284 (Ct. App. 1976) ("[W]here the evidence is inconsistent or contradictory, it is the function of the jury to resolve the conflict and not the function of this Court to resolve the conflict as a matter of law."). We affirm the district court's decision to deny the motion for additur.

## III.    CONCLUSION

**{39}**    We affirm on all issues.

**{40}    IT IS SO ORDERED.**

 

 

 

                                                                    **CELIA FOY CASTILLO, Chief Judge**

**I CONCUR:**

 

**CYNTHIA A. FRY, Judge**

**RODERICK T. KENNEDY, Judge (dissenting)**

**KENNEDY, Judge (dissenting).**

**{41}** I wholeheartedly agree with the majority that Hicks is entitled to recover from Eller. Eller was invited to Hicks' house as an expert on art appraisal without which he would have had neither the opportunity to see the paintings he knew possessed qualities and value which Hicks did not know about and, second, to make an offer on them. Hicks asked him: "Is that a fair price?" Eller refused to answer her question. The majority may correctly be puzzled by this being called a "bait and switch," but I might suggest the more proper term for Hicks to have used would have been "a wolf in sheep's clothing." Eller's defense of "I was no longer there as an appraiser" may excuse him under the UPA, but it is still morally and ethically repugnant, existing beyond the permissible fringe of honest dealing. As noted above, but for his advertising and expertise, he would not have been there at all. Had our courts not already taken a position that the UPA only inures to the benefit of a buyer, I could urge that the UPA's language was broad enough to encompass a purchasing professional like Eller's participation in such a lie to take unfair advantage of a superior position in any transaction involving a sale of goods. *Stare decisis* compels my concurrence with the majority as to the UPA claim.

**{42}** I write separately though, to adopt the "minority" view cited by the Opinion as to the negligent misrepresentation claim. I was persuaded by these cases that the analysis of negligent misrepresentation requires two components, only one of which—the negligence of the representation—involves negligence. The other element of justified reliance on the misrepresentation by the misrepresentation's recipient is an element requiring an assessment not of negligence in reliance, but justification. The "minority" view holds that to compare negligence in reliance negates the requirement of "justified" reliance entirely, a point with which I agree. Justification is therefore not to be graded on a sliding scale or "the curve." A recipient of a misrepresentation, to my mind, is either "justified" in her reliance or is not. In this case, being aware of Eller's purported expertise and professional standing as an appraiser, Hicks was entirely justified in relying on his misrepresentation. I would have denied the comparative negligence instruction and regarded its presentation to the jury as error. As a result, I believe Hicks was entitled to everything she lost to Eller, unreduced by the erroneous concept of comparative fault. And, for this reason, I respectfully dissent.

---

        **RODERICK T. KENNEDY, Judge**

**Topic Index for *Hicks v. Eller*, Docket No. 30,026**

**APPEAL AND ERROR**
Preservation of Issues for Review
Standard of Review

**CIVIL PROCEDURE**
Additur
Directed Verdict

**COMMERCIAL LAW**
Fraud
Unfair Practices Act

**NEGLIGENCE**
Comparative Negligence

**REMEDIES**
Additur and Remittitur

**TORTS**
Fraud
Misrepresentation